[Cite as *Cornelius v. Cornelius*, 2012-Ohio-6293.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| TRACY L. CORNELIUS, | : | Case No. 12CA19 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | DECISION AND |
| v. | : | JUDGMENT ENTRY |
| | : | |
| ALLEN F. CORNELIUS, | : | |
| | : | **RELEASED 12/14/12** |
| | : | |
| Defendant-Appellant. | : | |

_____
APPEARANCES:

Steven R. Fansler, West Liberty, Ohio, for appellant.

Gregg M. Emrick, McCauley, Webster & Emrick, Belpre, Ohio, for appellee.
_____
Harsha, J.

{¶1}    Allen Cornelius appeals from the trial court's judgment in this contested divorce action. Mr. Cornelius contends that the trial court abused its discretion when it selected the de facto termination date of the marriage. He claims the parties made a bilateral decision to end the marriage in 2008, two years earlier than the date the court chose. However, the court was free to believe Tracy Cornelius' testimony that she did not give up on the marriage until the end of 2010, particularly in light of evidence of Mr. Cornelius' continued participation in the marriage after 2008. Therefore, the trial court's selection of the termination date was not unreasonable, arbitrary, or unconscionable.

{¶2}    Next, Mr. Cornelius claims the trial court committed plain error when it ordered him to make Ms. Cornelius the beneficiary of a life insurance policy to the extent of his spousal support obligation. He argues that this provision implicitly requires that he pay support after his death, in violation of R.C. 3105.18(B) and in contradiction

of the court's explicit order that support would terminate on the death of either party. However, we interpret the insurance provision as an order to secure payment of any arrearage that might exist at the time of Mr. Cornelius' death, not as a continuing support provision. And because Mr. Cornelius failed to establish that a trial court cannot order a payor spouse to use life insurance to secure a potential future arrearage, we conclude no plain error occurred.

{¶3}  Mr. Cornelius also complains that the court abused its discretion when it ordered him to pay Ms. Cornelius $3,000 per month in spousal support, especially in light of his other financial obligations under the divorce decree. However, Mr. Cornelius earns in excess of $100,000 per year while Ms. Cornelius was a homemaker for the vast majority of the 23 year marriage. Moreover, she takes medication that impacts her ability to obtain above minimum wage employment. Mr. Cornelius' other obligations under the decree are short-term, and he failed to demonstrate that the award is unreasonably high while those obligations remain outstanding. Finally, many of the R.C. 3105.18(C)(1) factors support the award. Therefore, the court did not act unreasonably, arbitrarily, or unconscionably when it determined the amount of the award.

{¶4}  Finally, Mr. Cornelius argues that the court committed plain error when it awarded Ms. Cornelius spousal support for an indefinite period of time. However, the court's implicit finding that Ms. Cornelius lacks the ability, potential, and resources to be self-supporting is supported by the evidence. Thus, the court did not err, let alone commit plain error, when it made an award of indefinite duration.

I.  Facts

{¶5}    After the parties married in 1987, they had three daughters; one of whom is still a minor and will turn 18 in 2014.  During the marriage, Ms. Cornelius was primarily a homemaker, and the family lived on Mr. Cornelius' salary.  Beginning in 2005, Mr. Cornelius was unemployed for approximately 18 months.  He accepted employment in November 2006 in Virginia where he rented a room in a house and initially came home every weekend.  The parties anticipated that the entire family would eventually move to Virginia but they delayed this plan because of high housing costs in Virginia and their middle child's desire to finish high school in Ohio.  After the child graduated, they continued to delay the family move.  As time went on, the parties decided they were no longer compatible.

{¶6}    Ms. Cornelius filed for divorce on January 14, 2011.  The matter proceeded to a bench trial before a magistrate where the parties largely agreed on matters related to their minor child and the property division.  The primary points of contention were spousal support and the termination date of the marriage, which was significant because Mr. Cornelius' retirement assets increased $184,186.77 between the different de facto termination dates the parties urged the court to select.  The magistrate recommended that the trial court use December 31, 2010, the date Ms. Cornelius advocated for, as the de facto termination date.  The magistrate also recommended that Mr. Cornelius pay Ms. Cornelius $3,000 per month in spousal support for an indefinite period of time and designate Ms. Cornelius as his life insurance beneficiary to the extent of the support obligation.  Mr. Cornelius filed objections to the magistrate's decision, complaining in part about the recommended termination date and amount of spousal support.  The trial court overruled the objections and adopted the

magistrate's recommendations.  This appeal followed.

## II.  Assignments of Error

**{¶7}**   Mr. Cornelius assigns the following errors for our review:

I.       THE TRIAL COURT ERRED IN NOT SELECTING THE END OF CALENDAR YEAR 2008 AS THE DE FACTO TERMINATION DATE OF THE MARRIAGE.

II.      THE TRIAL COURT ERRED IN REQUIRING HUSBAND TO DESIGNATE WIFE AS BENEFICIARY OF A LIFE INSURANCE POLICY TO THE EXTENT OF THE SPOUSAL SUPPORT OBLIGATION.

III.     THE TRIAL COURT ERRED AND ORDERED AN EXCESSIVE AMOUNT OF SPOUSAL SUPPORT BY ORDERING APPELLANT TO PAY THREE THOUSAND DOLLARS ($3,000.00) PER MONTH OF SPOUSAL SUPPORT.

IV.     THE TRIAL COURT ERRED IN CREATING AN INDEFINITE DURATION FOR SPOUSAL SUPPORT.

## III.  Duration of the Marriage

**{¶8}**   In his first assignment of error, Mr. Cornelius contends that the trial court erred when it selected the de facto termination date of the marriage.  "Trial courts possess broad discretion in choosing the appropriate marriage termination date for purposes of property valuation."  *Soulsby v. Soulsby*, 4th Dist. No. 07CA1, 2008-Ohio-1019, ¶ 26, citing *Berish v. Berish*, 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982).  "Thus, we will not disturb the termination of marriage date absent an abuse of discretion."  *Id.*, citing *Berish* at 319.  The phrase "abuse of discretion" implies that the court's attitude is unreasonable, unconscionable, or arbitrary.  *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).  "When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court."  *In re Jane Doe 1*, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1991).

**{¶9}** "The duration of the marriage is critical in distinguishing marital, separate, and post-separation assets and liabilities, and determining appropriate dates for valuation." *Liming v. Damos*, 4th Dist. No. 08CA34, 2009-Ohio-6490, ¶ 26, citing *Eddy v. Eddy*, 4th Dist. No. 01CA20, 2002-Ohio-4345, ¶ 23. Under R.C. 3105.171(A)(2), "during the marriage" means whichever of the following is applicable:

> (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

> (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

**{¶10}** "Thus, the court may presume the date of the final hearing for divorce is the appropriate termination date of the marriage unless the court determines that the application of such a date would be inequitable." *Liming* at ¶ 27. Accordingly, "[e]quity may occasionally require valuation as of the date of the de facto termination of the marriage. The circumstances of a particular case may make a date prior to trial more equitable for the recognition, determination and valuation of relative equities in marital assets." *Berish*, *supra*, at 320. As the *Berish* Court explained:

> The choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations. The public policy giving rise to equitable distribution is at least in part an acknowledgment that marriage is a shared enterprise or joint undertaking. While marriage is literally a partnership, it is a partnership in which the contributions and equities of the partners do differ from individual case to individual case. Assets acquired by the joint efforts of the parties should be, on termination, eligible for distribution. But the precise date upon which any marriage irretrievably breaks down is extremely difficult to determine, and this court will avoid promulgating any unworkable rules with regard to this determination. It is the equitableness

of the result reached that must stand the test of fairness on review. *Id.* at 319-320.

**{¶11}** "This court has noted that trial courts generally 'use a de facto termination of marriage date when the parties separate, make no attempt at reconciliation, and continually maintain separate residences, separate business activities and/or separate bank accounts.' " *Murphy v. Murphy*, 4th Dist. No. 07CA35, 2008-Ohio-6699, ¶ 38, quoting *Soulsby*, *supra*, at ¶ 29. "Courts should be reluctant to use a de facto termination of marriage date solely because one spouse unilaterally vacates the marital home." *Soulsby* at ¶ 29. However, the " 'trial court may use a de facto termination of marriage date when the evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances.' " *Murphy* at ¶ 38, quoting *Soulsby* at ¶ 29.

**{¶12}** The parties agree with the trial court's implicit determination that it would be inequitable to use the date of the final hearing as the termination date of the marriage. However, Mr. Cornelius claims that the trial court erred when it used December 31, 2010, the date Ms. Cornelius sought, as the de facto termination date. He argues that the court should have used December 31, 2008. The value of Mr. Cornelius' retirement accounts increased $184,186.77 between this date and the date the trial court used.

**{¶13}** Mr. Cornelius argues that the following facts unequivocally demonstrate the parties made a bilateral decision to terminate the marriage by the end of 2008. By May 2007, both parties knew Ms. Cornelius and the girls would not be moving to Virginia. The last family vacation occurred in 2007. Ms. Cornelius and the children took a vacation without him in July 2008. The last traditional family holiday schedule

occurred in 2007. Mr. Cornelius testified that sexual relations ended after 2007.

Although Ms. Cornelius testified that they might have ended in 2009, she was not

certain. During Easter 2008, the parties seriously talked about a divorce or dissolution,

and the first separation agreement draft was made in 2008. "An attorney responded to

Mrs. Cornelius about the separation agreement in August 2008, even though the

separation agreement was not signed * * *." (Appellant's Br. 7). Mr. Cornelius set up a

separate bank account when he moved to Virginia. The parties signed up for a class for

divorcing parents before the end of 2008 even though they did not actually attend until

early 2009. The parties never sought counseling, and the record is devoid of attempts

at reconciliation. Mr. Cornelius explicitly testified no attempts were made in 2009 or

2010. Mrs. Cornelius stated in various affidavits that the parties separated in 2008. In

addition, Mr. Cornelius argues evidence that the parties' finances remained intertwined

after 2008 is not dispositive because Ms. Cornelius did not work and the parties had a

common interest in making sure "all necessary payments were made, that the principal

marital asset (the house) was maintained, and that the three daughters were provided

for." (Appellant's Br. 9). He did these things "as a business arrangement, as a parent,

and as a father, but no longer as a husband." (Appellant's Br. 9).

{¶14} Undoubtedly the evidence indicates the parties had marital problems and

contemplated legal separation by the end of 2008. Nonetheless, we defer to the trial

court's determination on this issue as long as it is based upon reason and has factual

support in the record. Based on the testimony at the divorce hearing, the trial court

could reasonably conclude that Mr. Cornelius' desire to end the marriage was unilateral

until December 2010. The trial court was free to believe Ms. Cornelius' testimony that

until then, she remained hopeful that the parties would resolve their problems as they had in the past, i.e., with the passage of time as opposed to formal counseling, particularly in light of Mr. Cornelius' continued participation in the marriage.  As the court pointed out, neither party had an extramarital affair.  The parties never reached a separation agreement, and Mr. Cornelius "took no steps to legally terminate the marriage.  He continued in the same pattern of behavior after the date of the alleged de facto termination as before, coming home on a regular basis, providing support, etc., until [Ms. Cornelius] filed for divorce."  Therefore, the trial court's selection of the de facto termination date was not unreasonable, arbitrary, or unconscionable.  And because the court did not abuse its discretion, we overrule the first assignment of error.

### IV.  Life Insurance Proceeds

{¶15}  In his second assignment of error, Mr. Cornelius contends that the trial court erred when it ordered him to designate Ms. Cornelius as a beneficiary of his life insurance policy to the extent of his spousal support obligation.  Mr. Cornelius already had a life insurance policy at the time of the divorce.

{¶16}  Because Mr. Cornelius did not make this argument in his objections to the magistrate's decision, he forfeited all but plain error.  *See* Civ.R. 53(D)(3)(b)(iv).  "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."  *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.

**{¶17}** In the divorce decree, the court states that spousal support "shall automatically terminate upon the death of either party or in the event of the [Ms. Cornelius'] remarriage or cohabitation in a state comparable to marriage." Later, the court states that "Defendant shall designate the Plaintiff as the beneficiary of a life insurance policy to the extent of his child support and spousal support obligations provided in this Entry." Mr. Cornelius argues that the spousal support portion of the insurance provision violates R.C. 3105.18(B), which states: "Any award of spousal support * * * shall terminate upon the death of either party, unless the order containing the award expressly provides otherwise." He construes the insurance provision as an impermissible, implicit order to pay spousal support after his death.

**{¶18}** Mr. Cornelius cites *Sutmoller v. Sutmoller*, 12th Dist. No. CA2011-03-020, 2011-Ohio-5450, *overruled on other grounds by Ornelas v. Ornelas*, 12th Dist. No. CA2011-08-394, 2012-Ohio-4106, in support of his argument. In that case, the trial court ordered the husband to pay the wife spousal support in "the sum of $1,500.00 per month, plus 40% of any gross commissions, for a period 9 1/2 years, or upon the death of either party or [the wife's] remarriage or her cohabitation with an unrelated adult in a relationship similar to marriage, whichever event occurs earlier." *Sutmoller* at ¶ 2. The trial court also ordered the husband to secure the spousal support obligation by "maintain[ing] $100,000.00 of life insurance" payable to the wife." *Id.* The Twelfth District cited R.C. 3105.18(B) as the controlling statute and concluded that because the trial court "expressly determined that the 'death of either party' terminates the support order * * * that portion of the divorce decree ordering appellant to maintain life insurance in order to secure his spousal support obligation is unreasonable and inappropriate." *Id.*

at ¶ 15.

{¶19} We find *Sutmoller* unpersuasive because from the brief analysis given, it is unclear why the court interpreted the life insurance provision as an implicit order for continued support payments after the husband's death. Here, the trial court stated that Mr. Cornelius only had to designate Ms. Cornelius as the beneficiary "to the extent of his * * * spousal support obligations provided in this Entry." The entry explicitly states that the support obligation ends when Mr. Cornelius dies. Thus, the most logical interpretation of the life insurance provision in this case is as an order to secure payment of any arrearage that exists at the time of Mr. Cornelius' death. In other words, the provision does not extend payments beyond his death – which would contradict the express language of the decree – but rather ensures that Ms. Cornelius will receive any money owed to her at the time of his death because of his contempt.

{¶20} Mr. Cornelius argues that a trial court can only order a payor spouse to maintain life insurance to secure an arrearage that exists at the time the court issues the divorce decree, not an arrearage that develops after the issuance of the divorce decree. He cites *Krone v. Krone*, 9th Dist. No. 25450, 2011-Ohio-3196, in support of his argument. In *Krone*, the trial court awarded the wife spousal support totaling $668,644 and ordered the husband to pay her $6,000 per month until payment was made in full. On appeal, the husband complained that the court ordered him to maintain life insurance to secure his spousal support obligation. The Ninth District noted that it "has consistently held that a trial court errs in ordering an obligor to secure a spousal support obligation terminable upon death with life insurance." *Krone* at ¶ 28. However, the court recognized that it previously held that a trial court "did not abuse its discretion by

ordering the husband to secure his arrearage of spousal support payments with a life insurance policy." *Id.*, citing *Karis v. Karis*, 9th Dist. No. 2380, 2007-Ohio-759, ¶ 18. The husband in *Krone* stipulated that he had support arrears of $47,279.94. The Ninth District held that the trial court did not abuse it discretion by ordering the husband to secure payment of the arrearage with a life insurance policy because "'this obligation reflects an amount due to Wife as a result of Husband's contempt rather than his ongoing spousal support obligation[.]'" *Id.*, quoting *Karis* at ¶ 18.

{¶21} The *Krone* Court did not specifically address whether a trial court can order a payor spouse to secure payment of a possible future support arrearage with a life insurance policy. Nor does Mr. Cornelius give us any reason why we should draw a distinction between an existing and potential future arrearage. Thus, we see no reason why the court could not require Mr. Cornelius, who had an existing life insurance policy, to secure payment of any arrearage that exists on his death.

{¶22} So long as Mr. Cornelius remains current on his spousal support payments, Ms. Cornelius will not receive any money from his life insurance policy for unpaid spousal support, i.e., she is merely a contingent beneficiary. Mr. Cornelius will be able to designate his insurance proceeds to whomever he wishes (subject to the court's uncontested order that he also designate Ms. Cornelius as his beneficiary to the extent of his child support obligation). Therefore, we conclude the trial court did not err, let alone commit plain error, when it ordered Mr. Cornelius to secure payment of any future spousal support arrearage with a life insurance policy. We overrule the second assignment of error. However, we do remand this matter for the trial court to more clearly express in the decree the fact that, with regard to spousal support, Mr. Cornelius

need only designate Ms. Cornelius as his beneficiary to the extent of any arrearages that develop.

## V.  Spousal Support

**{¶23}**  In his third assignment of error, Mr. Cornelius challenges the amount of the spousal support award and contends that the trial court's $3,000 per month award is excessive.  In his fourth assignment of error, he challenges the duration of the spousal support award and argues that the court erred in awarding support for an indefinite period of time, i.e., until the death of either party, remarriage of Ms. Cornelius, or cohabitation of Ms. Cornelius in a state comparable to marriage.

**{¶24}**  Trial courts have broad discretion in establishing spousal support awards. *Machesky v. Machesky*, 4th Dist. No. 10CA3172, 2011-Ohio-862, ¶ 17.  Ordinarily, we will not reverse a spousal support award absent an abuse of that discretion.  *Id.*  The phrase "abuse of discretion" implies that the court's attitude is unreasonable, unconscionable, or arbitrary.  *Adams*, *supra*, at 157.  But "[w]hile the decision to award spousal support is discretionary, an appellate court reviews the factual findings to support that award under a manifest weight of the evidence standard."  *Leopold v. Leopold*, 4th Dist. No. 04CA14, 2005-Ohio-214, ¶ 11.  We will not reverse the trial court's factual findings if they are supported by some competent, credible evidence.  *Downs v. Downs*, 4th Dist. No. 07CA2998, 2008-Ohio-3702, ¶ 21.

**{¶25}**  Although Mr. Cornelius clearly complained about the amount of the award in his objections to the magistrate's decision, he did not specifically complain about the indefinite duration of the award.  Thus, he has forfeited all but plain error on the issue of duration.  *See* Civ.R. 53(D)(3)(b)(iv).  Again, "[i]n appeals of civil cases, the plain error

doctrine is not favored and may be applied only in the extremely rare case involving

exceptional circumstances where error, to which no objection was made at the trial

court, seriously affects the basic fairness, integrity, or public reputation of the judicial

process, thereby challenging the legitimacy of the underlying judicial process itself."

*Goldfuss*, *supra*, at syllabus.

{¶26} R.C. 3105.18(B) provides: "In divorce and legal separation proceedings,

upon the request of either party and after the court determines the division or

disbursement of property under section 3105.171 of the Revised Code, the court of

common pleas may award reasonable spousal support to either party. * * * An award of

spousal support may be allowed in real or personal property, or both, or by decreeing a

sum of money, payable either in gross or by installments, from future income or

otherwise, as the court considers equitable."

{¶27} R.C. 3105.18(C) states:

(1) In determining whether spousal support is appropriate and reasonable,
and in determining the nature, amount, and terms of payment, and
duration of spousal support, which is payable either in gross or in
installments, the court shall consider all of the following factors:

(a) The income of the parties, from all sources, including, but not limited
to, income derived from property divided, disbursed, or distributed under
section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the
parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that
party will be custodian of a minor child of the marriage, to seek

employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

(2) In determining whether spousal support is reasonable and in determining the amount and terms of payment of spousal support, each party shall be considered to have contributed equally to the production of marital income.

**{¶28}** " 'When making an award, the trial court must consider all of the factors under R.C. 3105.18(C), and must not base its determination upon any one of the factors taken in isolation.' " *Machesky*, *supra*, at ¶ 19, quoting *Brown v. Brown*, 4th Dist. No. 02CA689, 2003-Ohio-304, ¶ 10.  The trial court commented on the majority of the above factors in ruling on Mr. Cornelius' objections.  But since neither party requested findings of fact and conclusions of law, the trial court did not have to list and comment on each factor.  *Brown* at ¶ 10.  Although in this context we presume the court considered all of

the factors, *Downs*, *supra*, at ¶ 16, "[t]he trial court must indicate the basis for its

spousal support award in sufficient detail to enable us to determine that 'the award is

fair, equitable and in accordance with the law.' " *Brown* at ¶ 10, quoting *Kaechele v.*

*Kaechele*, 35 Ohio St.3d 93, 518 N.E.2d 1197 (1988), paragraph two of the syllabus.

Here, the trial court did so.

A. Amount of Spousal Support

**{¶29}**  In the third assignment of error, Mr. Cornelius argues that the court

abused its discretion when it awarded Ms. Cornelius $3,000 per month in spousal

support.  In ruling on Mr. Cornelius' objection to the amount of the award, the trial court

stated:

> The Court finds that this is a long term marriage; that the 51 year old Wife has a very minimal employment history, having stayed home to care for the minor children of the parties by agreement of the parties; that the Wife has migraines and the medication that controls this condition negatively affects her cognitive abilities and her opportunities for employment above minimum wage; that the Wife has anticipated expenses in excess of $4,000.00 per month, including her health insurance costs.  The 51 year old Husband has had substantial employment over the course of the marriage and is now making, and will likely continue to make, in excess of $109,000 per year; the Husband is in good health and has health insurance available to him through employment at a cost of $40.00 per paycheck; and the cost of living in Virginia is higher than the cost of living in Ohio.  The Court lacks any specific evidence of the anticipated expenses of the Husband, other than the cost of a rented room where the Husband currently lives.  Each party has vehicles that are paid for.  The retirement benefits have been equally divided to date, with an offset against the Wife's share of $67,410.52 of a fully vested IRA to equalize the property division.  The Husband should have the ability to add to his retirement benefits over time.  The Wife likely will not, other than to qualify for Social Security and Medicare on her own account.  The Husband will be paying the home equity loan on the home of the Wife with a balance of around $28,000.00.  This is the only debt of the parties.
>
> The major complaint is the size of the [spousal support] award, that it leaves the Husband with too little cash and results in payment to the

Wife above her reasonable needs.

The Husband includes a calculation of his available cash. He argues that after federal taxes he will only have $2,873.00 per month before state taxes and all other expenses including the home equiline payment. The calculation by the Husband as to the tax he will pay is incorrect in two important ways. First, the Husband will not pay income tax on the spousal support amount, so that amount is deducted from his gross income *before* any tax calculation is made. Second, the amount of tax payable is not a straight percentage applied to the balance. The balance, after the deduction of spousal support, is then further reduced by exempt amounts and by deductions, either standard or itemized. This further reduced balance, the amount on which tax is paid, is not then simply multiplied by the highest tax bracket amount, but a graduated calculation is done of 10% on the first bracket amount, $8,700.00, 15% of the second bracket amount, $8,700.00 to $35,350.00, and 25% of the excess to $60,289.00, and then 28% of the amount above that.

The Court has made a rough calculation of the financial impact of the spousal support award. * * * Roughly, the Husband will pay $11,000.00 in federal and state income taxes with $7,940.00 in Social Security and Medicare, if he claims himself and one minor child and takes the standard deduction. With the real estate payment he may be able to itemize, which would reduce his taxes and increase his available cash. After deduction of taxes, spousal support, and child support, he has available $43,149.00 per year, or $3,595.00 per month. When the youngest child turns 18 and graduates from high school in 2014, his available cash increases to $51,816.00 per year or $4,318.00 per month. If Wife does not work, pays income taxes on the spousal support, and has no dependents to claim, she will have available cash of $3,223.00 per month, which decreases to $2,506.00 per month, when the youngest attains the age of 18. If she is able to find a full-time, minimum wage job and takes no time off ($7.70 per hour, 2080 hours per year), she will have available cash of $4,114.20 per month, reduced to $3,397.00 per month when she no longer receives child support in 2014. She is unlikely to be able to obtain employment that will provide her with benefits available to the Husband, such as paid vacations, reasonably priced health insurance, and retirement benefits.

In light of these figures, there is no need to carefully scrutinize the Wife's budget. She won't be able to meet it after 2014, and will only be able to meet it until then if she obtains full-time minimum wage employment and takes no time off.[1]

---

[1] In ruling on the objection to the amount of spousal support, the court stated that the magistrate's decision was "not an abuse of discretion." Although Mr. Cornelius does not raise the issue, this is not the appropriate standard for a trial court's review of a magistrate's recommendations. However, the court

**{¶30}** On appeal, Mr. Cornelius argues that the amount of the award penalizes him and allows Ms. Cornelius to have a higher standard of living than she had during the marriage. Mr. Cornelius complains that the court considered his Virginia salary in calculating the award. He contends that when the parties lived together in Ohio, he experienced periods of unemployment. The last time he earned a salary in Ohio, it was only $60,000 per year, and his highest salary ever in Ohio was $67,000. Mr. Cornelius suggests that the support award should be based on his Ohio income, instead of his Virginia salary (which exceeds $100,000) because he "only experienced his present level of income after the parties separated." (Appellant's Br. 20).

**{¶31}** However, we already determined that the trial court did not abuse its discretion when it held that the de facto termination date of the marriage was December 31, 2010. *See* Section III above. Thus, for over four years of the marriage (November 2006 to December 2010), Mr. Cornelius worked at his Virginia job. Under R.C. 3105.18(C)(2), Ms. Cornelius is considered to have contributed equally to the production of that income. Thus, we see no reason why the court had to base its spousal support calculation on Mr. Cornelius' pre-2006 income levels.

**{¶32}** Mr. Cornelius complains that the amount of support is too high when considered along with his other obligations under the divorce decree. In addition to spousal support, the court ordered him to pay $716.63 per month in child support (while private health insurance is provided for the child) and $4,000 to Ms. Cornelius for attorney fees within six months of the decree. The court also ordered him to pay off a Peoples Bank loan with a balance of roughly $28,000 by June 1, 2015. Mr. Cornelius

---

also stated that the magistrate's decision was "consistent with the law and the evidence," indicating the court conducted an independent review of the evidence as it was required to do. *See* Civ.R. 53(D)(4)(d).

argues that "[b]ecause there is interest involved, he will need to pay over $1,000.00 per month to comply with that portion of the Court's order." (Appellant's Br. 20). He construes the decree as an order to pay Ms. Cornelius "approximately $5500.00 per month, or $66,000.00 per year[ ] for the next six months and then $4800.00 per month, $57,600.00 per year, for the next 24 months * * *." (Appellant's Br. 21). He claims that the court abused its discretion by ordering him to pay "more than 50 percent of his gross income to his wife." (Appellant's Br. 22).

{¶33} Regarding the loan payment, Mr. Cornelius failed to demonstrate how he calculated the interest and came up with the over $1,000 per month payment figure. Even if he had, we disagree with his characterization of this payment as money Ms. Cornelius receives; it is money Peoples Bank will receive for a marital debt. Mr. Cornelius ignores the fact that the trial court reduced Ms. Cornelius' share of the retirement assets by $14,034.34 – one-half the amount owed on the loan – to account for the fact that Mr. Cornelius would pay off the loan by himself. And while the loan payments will reduce Mr. Cornelius' available cash, this reduction is only temporary. If he complies with the court's order, the loan will be paid off by June 1, 2015, i.e., a little over three years after the entry of the final decree.

{¶34} The other financial obligations Mr. Cornelius complains about – attorney fees and child support – are also short-term obligations. Under the court's order, Mr. Cornelius' obligation to reimburse Ms. Cornelius for a portion of her attorney fees will end within six months of the final decree. Moreover, this is not money that somehow increases her standard of living – it is money for her to apply to the debt she incurred in obtaining the divorce. In addition, Mr. Cornelius' child support obligation will cease on

May 15, 2014, i.e., approximately two years after the entry of the divorce decree.

{¶35} Thus, for the first six months after entry of the decree, Ms. Cornelius will receive approximately $4,383.29 per month ($3,000 spousal support + $666.66 attorney fees + 716.63 child support). After the first six months and until May 15, 2014, she will receive $3,716 per month ($3,000 spousal support + $716.63 child support). After May 15, 2014, she will simply receive $3,000 per month spousal support. The most money Ms. Cornelius will ever receive is in the first year following the divorce decree when she will get approximately $48,595.74, including attorney fees (($4,383.29 x 6) + ($3,716 x 6)). This is less than half of Mr. Cornelius' gross income. If we take the loan payment into consideration and presume Mr. Cornelius will pay $1,000 per month on it until June 1, 2015, during the first year he will pay $60,595.74 ($48,595.74 + $12,000) under the decree. This amount represents about 56% of his annual gross income of $109,000. But this fact alone is not per se proof that the court's award is unreasonable. After June 1, 2015, his only financial obligation under the decree will be $36,000 per year in spousal support – less than one-third of his current gross income.

{¶36} Mr. Cornelius complains that under the terms of the decree, he will be forced to live a low standard of living and continue to rent a room in Virginia while Ms. Cornelius lives in a house. It is not unreasonable for Mr. Cornelius to desire the financial ability to change his housing situation to secure his own apartment or home. But as the trial court pointed out, Mr. Cornelius failed to submit specific evidence on his living expenses aside from the cost of the rented room. While logic dictates that payment of spousal support, child support, attorney fees, and the loan will impact his standard of living, we can only speculate as to how much given the lack of evidence.

And again, most of this impact will be short-term because within approximately three years of the entry of the divorce decree, his only obligation is pay Ms. Cornelius $36,000 per year.

**{¶37}** Mr. Cornelius also insists that Ms. Cornelius will enjoy a greater standard of living than during the marriage because the court awarded her the marital residence, and she will not have a house payment. He argues that the court's order gives her the "luxury of not even attempting to work if she does not wish to do so." (Appellant's Br. 23.). However, the mere fact that Ms. Cornelius will receive $3,000 per month and not have a house payment does not prove that she is able to have an extravagant lifestyle compared to what she enjoyed during the marriage. This argument entirely fails to account for Ms. Cornelius' other expenses, which the trial court believed exceeded $4,000 per month, including health insurance costs. Under the court's calculations, even if Ms. Cornelius obtained a full-time, minimum wage job, she could not meet her budget after 2014 when child support stops. Mr. Cornelius does not challenge the court's findings on Ms. Cornelius' expenses or explain how those expenses are excessive compared to the marital expenses.

**{¶38}** Moreover, many of the trial court's findings on the R.C. 3105.18(C)(1) factors, which Mr. Cornelius does not challenge, support the award. Both parties are 51, but Mr. Cornelius has a four-year degree, and Ms. Cornelius only has a two-year degree. He was the primary breadwinner throughout the marriage; she has a "very minimal employment history" and was mostly a homemaker. In addition, the court found that Mr. Cornelius enjoys good health and has access to health insurance for $40.00 per paycheck. On the other hand, Ms. Cornelius is "unlikely to be able to obtain

employment that will provide her with * * * reasonably priced health insurance[.]"
Moreover, Mr. Cornelius can deduct spousal support for tax purposes, but the support is
taxable income for Ms. Cornelius.

{¶39} Mr. Cornelius attempts to characterize Ms. Cornelius as lazy because she
has no plans to go back to school and has not updated her resume recently. However,
the court found that the side effects of her migraine medication "negatively affect[ ] her
cognitive abilities and her opportunities for employment above minimum wage."
Logically, the side effects of her medication would also impact educational pursuits.
Moreover, given the fact that Ms. Cornelius has not worked since the late 1990s, it is
unclear what "updates" to her resume she could make that would enhance her ability to
secure above minimum wage employment.

{¶40} Mr. Cornelius also cites our decision in *Machesky*, in which we affirmed a
spousal support award of $750 for four years where the husband/payor spouse earned
roughly $78,000 per year. He argues that it is "inappropriate within the same appellate
district to have such widely variant spousal support obligations as exists between
Machesky and Cornelius." (Appellant's Br. 25). However, his argument ignores factual
differences between this case and *Machesky*. For instance, the husband in *Machesky*
earned roughly $30,000 less than Mr. Cornelius. In *Machesky*, the wife worked as a
restaurant server at the time of divorce. Here, Ms. Cornelius was primarily a
homemaker and satisfied the trial court that her medication limits her employment
opportunities.

{¶41} Mr. Cornelius has not demonstrated that the spousal support payments
are unreasonably high in light of the short-term nature of his other financial obligations

under the divorce decree, his failure to provide evidence on his living expenses, and his failure to challenge Ms. Cornelius' claimed expenses on appeal.  Moreover, several of the R.C. 3105.18(C)(1) factors support the award, and we must remain mindful that under the abuse of discretion standard, we cannot merely substitute our judgment for that of the trial court.  *In re Jane Doe I*, *supra*, at 137-138.  We conclude that the trial court's selection of the amount of the award is not unreasonable, arbitrary or unconscionable and overrule the third assignment of error.

### B.  Duration of Spousal Support

**{¶42}**  In the fourth assignment of error, which we emphasize we are reviewing for plain error, Mr. Cornelius complains that the court erred when it ordered him to pay spousal support indefinitely.  "The modern trend favors terminating alimony on a date certain.  The reason for awarding sustenance alimony payable only to a date certain is that the payee's need requiring support ceases, when, under reasonable circumstances, the payee can become self-supporting."  *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 69, 554 N.E.2d 83 (1990).  "[E]xcept in cases involving a marriage of long duration, parties of advanced age or a homemaker-spouse with little opportunity to develop meaningful employment outside the home, where a payee spouse has the resources, ability and potential to be self-supporting, an award of sustenance alimony should provide for the termination of the award, within a reasonable time and upon a date certain, in order to place a definitive limit upon the parties' rights and responsibilities."  *Id.*

**{¶43}**  Thus, under *Kunkle*, in determining whether to set a specific termination date for an award of spousal support, the court should first determine whether the

payee spouse has the resources, ability and potential to be self-supporting. *Yazdani-Isfehani v. Yazdani-Isfehani*, 4th Dist. No. 08CA3, 2008-Ohio-4662, ¶ 34 (Harsha, J., concurring). "If not, the court can make an award that is indefinite or permanent." *Id.* However, if the payee spouse possesses the resources, ability and potential to be self-supporting, the court should enter a reasonable termination date unless the court also finds the case involves a marriage of long duration, the parties are of advanced age, or the payee spouse was a homemaker-spouse with little opportunity to develop meaningful employment outside the home. *See id.*

**{¶44}** Here, the trial court implicitly found that Ms. Cornelius lacks the resources, ability, and potential to be self-supporting and awarded her indefinite support. Mr. Cornelius contends that this finding is against the manifest weight of the evidence. He points to the fact that Ms. Cornelius worked during the early years of the marriage, i.e., 1987-1990, and earned almost $20,000 during the year she worked in the late 1990s. Mr. Cornelius argues that Ms. Cornelius worked in spite of her migraines. He suggests that Ms. Cornelius could get an above minimum wage job but lacks incentive, as demonstrated by the fact that she has no plans to further her education, has not updated her resume, and "seems to have been looking for employment at fast food places." (Appellant's Br. 28). He argues that an indefinite award gives her no motivation. Mr. Cornelius suggests that the court should have awarded Ms. Cornelius support for a term certain, and that if she could not obtain meaningful employment by the expiration of the term, place the burden on her to seek a modification.

**{¶45}** However, the trial court did not find that Ms. Cornelius was simply unable to work because of her migraines. Instead, the court found that due to the *side effects*

of her migraine medication, which involve negative effects on her cognitive abilities, she will have difficulty obtaining above minimum wage employment. And given her expenses, the court concluded that even with a minimum wage job she could not meet her budget after 2014. These findings are supported by Ms. Cornelius' testimony, which the court was free to believe. As we explained in our discussion of the third assignment of error, Ms. Cornelius' ability to further her education would likely also be impaired by her medication. And it is unclear what resume updates Mr. Cornelius believes she should make given the fact that she has not worked outside the home for more than a decade. Moreover, we fail to see how the fact that Ms. Cornelius applied to work at fast food places proves that she lacks a desire to find "meaningful work."

**{¶46}** Mr. Cornelius also complains that he pays "more for a room" than Ms. Cornelius pays for the marital home and will receive "less of his income than she does." (Appellant's Br. 28). We already rejected similar arguments in our discussion of the third assignment of error.

**{¶47}** In addition, Mr. Cornelius suggests that at the latest, spousal support should end when the parties reach age 62 because Ms. Cornelius will be self-supporting then. He argues that because the parties were married more than 10 years, she will be able to draw on his social security account. He claims that Ms. Cornelius "will already be the owner of a substantial amount of retirement assets because of the distributive award in this case." (Appellant's Br. 29). He also argues that she received the marital home "with substantial value with 100% equity" and can obtain employment to improve her own retirement assets over the next ten years.

**{¶48}** However, it is unclear how much money Ms. Cornelius will receive from

social security.  Her share of the retirement assets is subject to the gains and losses from December 31, 2010, until the ultimate distribution dates for each account.  Thus, there is no guarantee that she will receive a particular sum from these accounts at age 62.  In addition, the court found that Ms. Cornelius is unlikely to obtain employment with retirement benefits.  Given the uncertainty as to the amount of income Ms. Cornelius will have at age 62 from sources other than spousal support, we will not second guess the trial court's failure to find that Ms. Cornelius will be self-supporting at age 62.

**{¶49}**  Given the limited nature of our review under the plain error doctrine, we cannot say this is one of those exceptional cases that seriously affects the basic fairness of the judicial process.  Therefore, we overrule the fourth assignment of error.

VI.  CONCLUSION

**{¶50}**  Having overruled the assignments of error, we affirm the trial court's judgment.  However, we remand for the trial court to more clearly state Mr. Cornelius' obligation under the life insurance provision in the decree.

JUDGMENT AFFIRMED<br>AND CAUSE REMANDED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that the CAUSE IS REMANDED.  Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Kline, J.:  Concurs in Judgment and Opinion.
Abele, P.J.:  Concurs in Judgment and Opinion as to Assignments of Error I, II, & IV;
                    Dissents as to Assignment of Error III.


For the Court


BY: _____
        William H. Harsha, Judge


### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**